UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

   -v-                                           CASE NO: 3:17-CR-0358 (TJM )

ROLAND KYZER,
                Defendant.

---

## SENTENCING MEMORANDUM OF DEFENDANT ROLAND KYZER

DATED: August 16, 2018                       Respectfully submitted,

                                              LISA A. PEEBLES
                                              Federal Public Defender

                                 By:   Courtenay K. McKeon, Esq.
                                             Assistant Federal Public Defender
                                             Bar Roll No. 515841
                                             Clinton Exchange, 3rd Floor
                                             4 Clinton Square
                                             Syracuse, New York   13202
                                             (315) 701-0080

On February 23, 2018, a jury found Defendant Roland Kyzer ("Mr. Kyzer") guilty of one count of receipt of child pornography (18 U.S.C. § 2252A(a)(2)A and (b)(1)) and one count of possession of child pornography (18 U.S.C. § 2252A(a)(5)(B) and (b)(2)). (Dkt. No. 35.) Sentencing is scheduled for August 22, 2018.

The United States Probation Department prepared a Presentence Investigation Report (*hereinafter* "PSR") on August 14, 2018, in anticipation of sentencing. (Dkt. No. 46.) The PSR sets forth a total offense level of 38 and a Criminal History Category of IV. *Id*. ¶¶ 38, 47. As discussed further below, the defense objects to the imposition of a five-level enhancement for "a pattern of activity involving the sexual abuse or exploitation of minors" and the two-level enhancement for "use of a computer or an interactive computer service." Accordingly, the defense contends that the appropriate total offense level is 31. With a Criminal History Category of IV and a total offense level of 31, the Guideline sentence in this case is 151 to 188 months. The mandatory minimum sentence is fifteen years—at the high end of the Guideline— due to Mr. Kyzer's previous conviction. 18 U.S.C. § 2252A(b)(1).

The defense submits this memorandum in support of its request that the Court impose the mandatory minimum sentence of fifteen years.

I.   FACTUAL BACKGROUND

Roland Kyzer was born in San Jose, California, in 1969. (Dkt. No. 46 at 2, 21 ¶ 48.) His family moved to Pennsylvania shortly after his birth. *Id*. ¶ 52. His parents separated when he was two years old. *Id*. ¶ 48. Mr. Kyzer was raised by his mother and her second husband. *Id*. ¶ 49. They moved to the Southern Tier when Mr. Kyzer was five years old. *Id*. ¶ 52. Mr. Kyzer has lived in Tioga County for most of his life. *Id*.

Mr. Kyzer is not comfortable speaking in any detail about his childhood. This reticence has been part of his character since he was a very young man. School records from 1985 refer to his "great difficulty expressing himself verbally, especially in regard to his feelings." (Dkt. No. 46 ¶ 62.) Despite this reticence, there are indications that he was abused. A psychological examination from 1986, when Mr. Kyzer was sixteen years old, viewed Mr. Kyzer's problems as "symptomatic of family dysfunction" and recommended family therapy. *Id.* ¶ 63. Friends who have known Mr. Kyzer since he was a teenager refer to his "victimization as a child." *Id.* ¶ 55. And, as mentioned below, Mr. Kyzer's stepfather was charged with sexually abusing Mr. Kyzer's sister. *Id.* ¶ 41.

When Mr. Kyzer was sixteen years old, he was charged with an attempted burglary and a burglary in separate incidents. (Dkt. No. 46 ¶¶ 41-42.) He was committed to Division for Youth ("DFY") custody and sent to live in group homes. *Id.* ¶ 52. He was not permitted to be released when originally scheduled because his stepfather was charged with sexually abusing Mr. Kyzer's sister and the family home was deemed unsuitable for Mr. Kyzer. *Id.* ¶ 41. He remained in group homes until he was eighteen. *Id.*

Mr. Kyzer was released from DFY custody and soon met Sherry Savage, with whom he has maintained a constant relationship ever since. (Dkt. No. 46 ¶ 53.) They were married for a time, have a son together, and consider themselves to be best friends. *Id.* ¶¶ 53-55. Ms. Savage testified on Mr. Kyzer's behalf at trial and has written a letter of support for him, which is being filed separately.

Mr. Kyzer lived a quiet life for the next decade and a half. He did not get into any trouble with the law from the time was sixteen years old until 2001, when he was thirty-two years old.

(Dkt. No. 46 ¶¶ 42-43.) In August 1989, at age twenty, he got a job as a machine operator at Stakmore Furniture in Owego, where he remained employed for the next eleven years. *Id*. ¶ 75.

In 1993, Mr. Kyzer became romantically involved with a woman named Aimiee Davis. (Dkt. No. 46 ¶ 56.) Aimee had been seriously abused as a child by her stepfather. (Exhibit A at 5; Exhibit B at 4.) At the time she became involved with Mr. Kyzer, Aimiee, who was only twenty years old, already had two children: "Child A" and "Child B." (Dkt. No. 46 ¶ 44.) "Child A," a boy, was four years old. "Child B," also a boy, was five years old. *Id*. In November 1995[1], Aimee gave birth to twins fathered by Mr. Kyzer. *Id*. "Child C" was a boy and "Child D" was a girl. *Id*.

In March 1997, Aimiee sent Child A to live with her mother and stepfather in Pennsylvania. (Dkt. No. 46 ¶ 44.) The stepfather was the same man who allegedly abused Aimiee during her childhood.

On October 24, 1997, a social worker in Bradford County, Pennsylvania, met with Child A at the request of Tioga County CPS. (Case No. 3:02-CR-0005, Dkt. No. 41 at 25-27.) Aimiee's stepfather was present during the beginning of the interview. *Id*.

The case worker asked Child A if he knew why he was there and he said "because Aimiee and Roland were molesting me." *Id*. When asked to point to a picture of a human figure and show where he had been touched, Child A never pointed to any area. *Id*. He said that Aimiee and Roland "sucked my peck hole." *Id*. He first said this happened at Christmas and then at Halloween a long time ago. *Id*. The case worker then asked Aimiee's stepfather to leave the room. *Id*. After he left:

> I tried a different approach with [Child A]. I asked him to draw me a picture, he said, he couldn't so I didn't press it. So, I asked [Child A] why did you

---

[1] The PSR lists the twins' birth month as December, but Mr. Kyzer has advised counsel that the correct month is November.

4

> come to see me? Do you know why you are here? He replied, to talk about Aimee, she sucked my "peter." I said, where were you when this was going on? He replied, "in my bedroom." How does this make you feel? It makes me "mad." How do you feel about Aimee? "I just get mad at her." I asked if anyone has ever taken his picture or showed him pictures? He said, "Amiee (sic) kept right on sucking and took his picture while doing it." He says, "she did it on purpose." Also, "Roland has showed me pictures of naked people." I asked if he sees Aimee and Roland? He replied, "no and I don't want to see 'em."

*Id*. at 25-26.

On November 4, 1997, the case worker informed Tioga County CPS that "[t]he child was consistent in saying how he was allegedly molested and who the alleged perpetrator was. However, he couldn't point or touch the area where he allegedly was being molested . . . ."(Case No. 3:02-CR-0005, Dkt. No. 41 at 24.)

The case was closed in December 1997 due to insufficient evidence. (Dkt. No. 46 ¶ 44.) Mr. Kyzer has always denied, and continues to deny, that this alleged abuse of Child A ever occurred.

In February[2] 1998, Aimiee had a daughter, Child E. (Dkt. No. 46 ¶ 44.) In March 1999, Aimiee had a son, Child F. *Id*.

On or about September 3, 2000, Mr. Kyzer left Aimiee to resume his relationship with Sherry Savage. (Exhibit A at 2.) Aimiee reacted by calling CPS. *Id*. She stated that Child B (her oldest son) reported that Child D (the female twin) told him that Mr. Kyzer had sexually abused her. (Dkt. No. 46 ¶ 44.) The investigation was closed due to lack of evidence. *Id*.

Although the investigation was closed due to lack of evidence, the allegation ruined Mr. Kyzer's hopes of reconciliation with Sherry. (Exhibit A at 2.) In August 2001, he moved in with a woman named Lisa. (Dkt. No. 46 ¶ 44.) Once again reacting to romantic relationship between

---

[2] The PSR lists this child's birth month as March, but Mr. Kyzer has advised counsel that the correct month is February.

5

Mr. Kyzer and another woman by making unfounded allegations, Aimiee almost immediately re-raised her earlier unsubstantiated allegations about Mr. Kyzer.

Within a month, on September 17, 2001, Child B gave a statement to the Tioga County Sheriff's Office. (Case No. 3:02-CR-0005, Dkt. No. 41 at 28.) When asked if he knew Roland Kyzer, the small child replied "Yes, he's the one who raped my sister." *Id*. When asked how he knew that Roland had raped [Child D], he said "I was upstairs and [Child D] came upstairs and told me that Roland had raped her that he had put his hand down her pants and had touched he (sic) privates." *Id*. He said this happened "at our white house in Candor" and that it happened "last year right after Christmas." *Id*. The interviewer asked, "Did Roland ever touch your or the other kids in their privates?" *Id*. Child B said "No." *Id*.

On September 18, 2001, Aimiee gave a statement to the Tioga County Sheriff's Department. (Case No. 3:02-CR-0005, Dkt. No. 41 at 14-15.) She stated that Mr. Kyzer sexually abused Child D and that she reported the abuse in 1999. *Id*. at 14. She said Child D told her that "daddy had put something down there" and that Child B "saw Roland with his hand down [Child D's] pants." *Id*. at 14. She stated that Child A "accused Roland of sucking his penis and making [Child A] touch his privates." *Id*. at 15. She stated that Mr. Kyzer was "big into child pornography." *Id*. She stated that neither she nor her children had had any contact with Mr. Kyzer since 1999. *Id*. When asked if she could remember any other incidents, she said that she could not. *Id*.

On November 6, 2001, a roommate and co-worker of Mr. Kyzer named Scott Phillips gave a statement to the Tioga County Sheriff's Department. (Case No. 3:02-CR-0005, Dkt. No. 41 at 29.) He stated that he had seen Mr. Kyzer "on the computer . . . viewing naked pictures of young girls." *Id*. at 29. This statement ultimately led to federal charges being filed against Mr.

6

Kyzer. Phillips also stated that once at Lisa's house he saw Roland on the couch with his arm around Lisa's six-year-old daughter. *Id*. at 30. That statement was never the basis of any charges.

Mr. Kyzer was arrested on November 7, 2001. Mr. Kyzer signed a waiver of his *Miranda* rights. (Case No. 3:02-CR-0005, Dkt. No. 41 at 8.) Two hours after executing the *Miranda* waiver, Mr. Kyzer signed a written statement. *Id*. at 9. In that statement, he stated that he sexually touched Child D once in 1999. *Id*. When asked whether he had "touched a young person sexually since that one time incident with your daughter," he replied that he had not. *Id*. In a separate statement on the same date, Mr. Kyzer admitted going to pornographic web sites on his computer, some of which featured images of naked children. *Id*. at 11-12.

Since November 2001, Mr. Kyzer has consistently stated that he never confessed to touching Child D and that he signed the written statement without reading it after being threatened. (Exhibit B at 1.)

On November 14, 2001, Lisa's son gave a statement to the Tioga County Sheriff's Department. (Case No. 3:02-CR-0005, Dkt. No. 41 at 31.) He said that Mr. Kyzer had never touched him, his younger brother, or his sister in an inappropriate or sexual way. *Id*. He said that he had seen Mr. Kyzer give his sister baths and sit on the couch with her in his arms. *Id*.

On November 14, 2001, Lisa's other son gave a statement to the Tioga County Sheriff's Department. (Case No. 3:02-CR-0005, Dkt. No. 41 at 32.) He, too, stated that Mr. Kyzer had never touched him in an inappropriate way. *Id*. He said, however, that his sister showed their grandmother with one of her dolls that Mr. Kyzer had touched her. *Id*. According to the boy, his sister was taken to the hospital "to be checked out but they didn't find anything." *Id*. He stated that a friend of his found four VHS tapes in Mr. Kyzer's trailer that had videos of "naked little girls having sex with older guys" recorded from WEB TV. *Id*.

On January 3, 2002, Mr. Kyzer was indicted in federal court for fifty-three counts of receipt of child pornography and two counts of possession of child pornography. (Case No. 3:02-CR-0005, Dkt. No. 7.) The receipt counts involved fifty-three separate images, each charged as its own count. *Id.*

On February 6, 2002, Child A was interviewed by the Tioga County Sheriff's Department and signed a written statement. (Case No. 3:02-CR-0005, Dkt. No. 41 at 22-23.) He stated that Mr. Kyzer and Aimiee "would tie my hands to the bed and they would play around with my penis and laugh, then they would suck my penis." *Id.* at 22. He stated that they took pictures of the abuse with both a video and still camera. *Id.* He stated that Mr. Kyzer "would put his penis inside my butt and then they would pour warm water over my penis and then start over again." *Id.* at 23. He stated that Child B, Child C, and Child D were also sexually abused by Mr. Kyzer and Aimiee. *Id.*

On February 6, 2002, Aimiee's sixteen-year-old stepsister was interviewed by the Tioga County Sheriff's Department. (Case No. 3:02-CR-0005, Dkt. No. 41 at 34.) She stated that Child A, Child B, and Child C were all physically abused. *Id.* She stated that she had observed a handprint on Child C's back that was turning black and blue as recently as three weeks earlier. *Id.* (This was, of course, many years after Mr. Kyzer had had any contact with the child.) The interviewer asked whether "the kids ever disclose[d] any sexual abuse by Roland or Aimiee." *Id.* She stated that Child A, Child B, and Child D, "have all told me that stuff happened to them, in fact, Child D told me that Roland would take showers with her and then he would caress her privates with his hand and Child B told my father in front of me that Roland was watching some nasty stuff on Web TV, mostly naked people." *Id.* at 34-35.

8

On February 8, 2002, Aimiee Davis gave another statement to the Tioga County Sheriff's Department. (Case No. 3:02-CR-0005, Dkt. No. 41 at 16-17.) Her story had changed rather dramatically since her last conversation with police. This time she stated that one night Mr. Kyzer "forced me to watch as he held my son [Child A] down and he gave [Child A] a blow job." *Id*. at 16. She denied sexually abusing Child A herself, as he alleged. *Id*. In contrast to her earlier statement, which included no such detail, she now stated that Child D told her that Mr. Kyzer "had suck[ed] her vagina." *Id*.

According to an FBI written account of the same interview, Aimiee told the investigators that she "gave up custody of [Child A] because she could not control him after he once set fire to his bed and to protect him from Roland Kyzer." (Case No. 3:02-CR-0005, Dkt. No. 41 at 18.) She admitted that she locked the children in their rooms and hit them "from time to time." *Id*. at 19. In contrast to her earlier statement, Aimiee now told investigators that Mr. Kyzer "physically abused all of the other children and that [Child D] in particular was repeatedly a target of Kyzer's sexual abuse." *Id*. She now stated that there were "numerous times" when Child D told her that Mr. Kyzer had "sucked me down there." *Id*. Whereas she had originally stated that she threw Mr. Kyzer out of the home in 1999 after one report of sexual abuse, she now stated that they remained together into 2000, that other people were present when Child D complained about abuse, and that she took Child D to Wilson Medical Center for examination. *Id*. at 20. She stated that she "could not recall" sexually abusing her children. *Id*. She stated, however, that "it was possible that she sexually abused [Child A] but could not recall." *Id*. at 21.

On February 11, 2002, Tioga County Family Court granted temporary sole custody of Child C, Child D, Child E, and Child F to Aimiee's stepfather. (Exhibit C.)

9

On February 19, 2002, Tacama L. Donahue gave a statement to the Tioga County Sheriff's Department. (Case. No. 3:02-CR-0005, Dkt. No. 41 at 40.) Her business was across from the home that Mr. Kyzer and Aimiee shared in Candor in 1999. *Id*. She stated that Aimiee showed her pictures of herself nude in bed with Child A and Child B and of Roland nude on the sofa with Child D and Child E. *Id*. at 41. She stated that Aimiee never asked her for help or stated that Roland abused her or the kids. *Id*. at 42.

On February 28, 2002, Mr. Kyzer wrote a letter to the Broome County Press and Sun Bulletin from Tioga County Jail. (Exhibit B.) He stated that he was writing the letter to protect the children from Aimiee's stepfather. *Id*. He denied abusing the children or possessing child pornography and stated that he signed the written confession only after being threatened. *Id*. He stated that he had never read the confession. *Id*.

On April 12, 2002, Mr. Kyzer signed a plea agreement in the federal case. (Case No. 3:02-CR-0005, Dkt. No. 17.) In that agreement, he agreed to enter a plea of guilty to one count of receipt of child pornography. *Id*. ¶ 1. In the plea agreement, Mr. Kyzer agreed to the following factual basis for his plea:

> Between in or about February of 1997 and the date of the filing of this Indictment, in the Northern District of New York, Roland Kyzer, while living at residences located at 12 Mill Street, Candor, New York; 203 Weiss Road Lot 3, Owego, New York; 211 Weiss Road, Owego, New York; and elsewhere in New York state, did in fact use his personal home computer as well as a subscription and access to cable "WEB T.V." in order to download and receive numerous child pornography images depicting children under the age of twelve years old engaged in sexual intercourse, sodomy and other explicit sexual acts with other children and with adults. These child pornography images received by Kyzer at his residences in the Northern District of New York were transported and shipped in interstate and foreign commerce, in that, the images received by Kyzer were transported by means of computer and cable "WEB T.V." from the states of California, Virginia, North Carolina, and also from the Russian Federation and Moscow, Russia.

10

*Id*. ¶ 5. The plea agreement included no facts about Mr. Kyzer's alleged abuse of Child D or any other child.

On July 3, 2002, Mr. Kyzer was convicted in Tioga County Court, upon a plea of guilty, to seven years in prison for one count of violating New York Penal Law § 130.65-3 (Sexual abuse in the first degree, victim less than eleven years old). (Exhibit D.) This guilty plea solely involved allegations about the single 1999 incident with Child D.

Mr. Kyzer's federal attorney filed a waiver of the presentence investigation report. (Case No. 3:02-CR-0005, Dkt. No. 25.) No PSR appears on the docket of the case. A probation officer did, however, prepare a PSR dated June 4, 2002. (Exhibit E.) The PSR contained extensive allegations about uncharged conduct involving Child A, Child B, Child C, and Lisa's children. *Id*. ¶¶ 7-22. The PSR stated that the allegations were based on "materials and information provided by the U.S. Attorney's Office, and interviews with the case agents." *Id*. ¶ 6. The current PSR repeats those allegations, nearly verbatim, in its description of the previous federal case. (Dkt. No. 46 ¶ 44.) Mr. Kyzer never had the opportunity to dispute the allegations when they appeared in the original PSR. (Exhibit A at 1.)

Sometime in 2009, Child D was removed from the custody of Aimiee's stepfather. (Exhibit F.) The court's order stated that "[t]he child should not be returned to the care of [Aimiee's mother and stepfather]. If the child and her siblings express a desire to visit each other, these visits should be supervised at Bradford County Children and Youth Services." *Id*. Mr. Kyzer has been informed that Aimiee's stepfather lost custody of all of the children because the stepfather abused them.

Mr. Kyzer was incarcerated until 2011. (Dkt. No. 46 ¶ 58.) He had no disciplinary problems while incarcerated. *Id*. ¶ 44. In 2014, he was sentenced to six months in prison as the

11

result of supervised release violations. (Case No. 3:02-CR-0005, Dkt. No. 56.) He was released to supervision on October 2, 2014. (Case No. 3:02-CR-0005, Dkt. No. 63.)

On November 14, 2016, a resident of the building where Mr. Kyzer lived and worked told a federal probation officer that he had witnessed Mr. Kyzer violating a number of terms of his supervised release. Probation officers arrived at Mr. Kyzer's residence at 7:00 a.m. the next day to search his room. They discovered, *inter alia*, a bag of thumb drives under his covers. Those thumb drives contained thousands of images of child pornography. Mr. Kyzer was arrested and charged with supervised release violations. (Case No. 3:02-CR-0005, Dkt. Nos. 57-58.) Over a year later, he was finally indicted in this case for two child pornography charges, which were both based on the images discovered during the probation officers' November 15, 2016, search. (Dkt. No. 1.)

Mr. Kyzer has professed his innocence since he was arrested in November 2016. He desperately wanted to testify on his own behalf at trial, but was advised not to because doing so would have opened the door to evidence regarding the complicated, prejudicial allegations about his conduct in 1999. The jury found him guilty on both of the new charges.

## II.    MR. KYZER HAS NOT ENGAGED IN "A PATTERN OF ACTIVITY INVOLVING THE SEXUAL ABUSE OR EXPLOITATION OF MINORS" AND ACCORDINGLY SHOULD NOT RECEIVE A FIVE-LEVEL INCREASE IN HIS TOTAL OFFENSE LEVEL.

The PSR assigns a five-level enhancement to Mr. Kyzer's total offense level under Guideline 2G2.2(b)(5) on the grounds that he "engaged in a pattern of activity involving the sexual abuse or exploitation of minors." (Dkt. No. 46 ¶ 29.) This enhancement does not apply to Mr. Kyzer because he has only ever been adjudicated guilty of abusing one minor and the government has not proven the uncharged conduct by a preponderance of the evidence.

Under the Guidelines, a "pattern of activity involving the sexual abuse or exploitation of minors" is "any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct." Sentencing Guidelines Manual § 2G2.2: Commentary (1) (U.S. Sentencing Comm'n 2016). The notes accompanying the Guidelines state that the phrase "sexual abuse or exploitation" does not include "possession, receipt, or trafficking in material relating to the sexual abuse or exploitation of a minor." *Id*.

The government bears the burden of proving by a preponderance of the evidence that an increase in the total offense level is warranted pursuant to Guideline § 2G2.2(b)(5). *See United States v. Bender,* 33 F.3d 21, 23 (8th Cir. 1994) ("The government has the burden of proof with respect to the base offense level and any enhancing factors."); *United States v. Stewart,* 462 F.3d 960, 964 (8th Cir. 2006) (applying *Bender* principles to § 2G2.2(b)(5) enhancement). Accordingly, the burden is not on Mr. Kyzer to disprove the government's allegations. Rather, the government bears the burden of proving by a preponderance of the evidence that Mr. Kyzer has abused or exploited—i.e., engaged in hands-on conduct rather than merely receiving or possessing images—a child on two or more separate occasions. The government cannot meet this burden.

As discussed at length above, Mr. Kyzer pleaded guilty to touching Child D on one occasion in 1999. He has steadfastly denied touching any other children. Several of the children whom Mr. Kyzer has been accused of touching have stated that he never touched them. Others offered inconsistent stories over the course of many years. There are strong indications that the statements offered by Child A and Child B were the result of coaching by their mother and

13

grandfather. The first two investigations that were launched as a result of those allegations were dismissed as unsupported by evidence. Nearly twenty years after the allegations first surfaced, it is no clearer what actually happened. Accordingly, the Court should decline to impose the five-level enhancement.

### III. MR. KYZER SHOULD NOT RECEIVE THE TWO-LEVEL INCREASE IN HIS TOTAL OFFENSE LEVEL FOR USE OF A COMPUTER OR INTERACTIVE COMPUTER SERVICE.

The PSR recommends a two-level increase in Mr. Kyzer's total offense level for "the use of a computer or interactive computer service for the possession, transmission, receipt, or distribution" of child pornography. (Dkt. No. 46 ¶ 30.) Sentencing enhancements, by their nature, should be imposed only where the defendant's conduct is more egregious than conduct in a garden variety case. The defense objects to the Court imposing the enhancement here because the use of a computer in this case was no different from the computer use present in the mine-run of cases.

When Congress acted on the view directed the Sentencing Commission to add the two-level enhancement for use of a computer, it was concerned with deterring the online <u>distribution</u> and <u>trade</u> of child pornography. 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Hatch) (purpose was to "increase[e] penalties for the use of computers in connection with the distribution of child pornography," in part to "ensure that [the information super] highway is not littered with the debris of child pornography"); *see also id.*(Senator Grassley) (purpose was to "discourage child pornographers from using computers to trade in child pornography").

But while Congress was concerned that computers would make it easy for dangerous offenders to disseminate and trade images, it did not tailor the computer enhancement to meet that concern. Instead, it required the Sentencing Commission increase penalties for those who are

14

not dangerous and who did not use the computer in the ways Congress imagined. The Commission has recognized that the enhancement sweeps too broadly and has indicated that the use of a computer might appropriately be considered an aggravating factor only when it was used to widely disseminate pornography or to make it accessible to children. See U.S. Sent'g Comm'n,1996 Report, at 28-30 & n.23; see also *United States v. Dorvee*, 616 F.3d 174, 186-87 (2d Cir. 2010) (recognizing the Commission's criticism); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1042 (E.D. Wisc. 2009) ("[S]ome computer users are more harmful than others, yet the enhancement provided no distinction.").

The wide sweep of the enhancement is illustrated by its prevalence. In Fiscal Year 2012, the enhancement was applied in 96.4% of cases. United States Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics for Fiscal Year 2012,* available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2012/Use_of_Guidelines_and_Specific_Offense_Characteristics_Guideline_Calculation_Based.pdf. In Fiscal Year 2013, it was applied in 95.3% of cases. *Use of Guidelines and Specific Offense Characteristics for Fiscal Year 2013,* available at https://www.gpo.gov/fdsys/pkg/USCOURTS-ca4-13-04412/pdf/USCOURTS-ca4-13-04412-1.pdf. In Fiscal Year 2016, the most recent year for which data is available, it was applied in 95% of cases. *Use of Guidelines and Specific Offense Characteristics for Fiscal Year 2016*, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2016/Use_of_SOC_Guideline_Based.pdf

Here, Mr. Kyzer did not use his computer to trade or knowingly disseminate images or to make images accessible to children. Nothing about his computer use distinguishes his case from

the run-of-the-mill child pornography receipt and possession case. He is not the offender Congress had in mind when it directed the Sentencing Commission to create the two-level enhancement. Therefore, the defense requests that the Court decline to impose the two-level enhancement for computer use.

### IV. THE 18 U.S.C. § 3553 FACTORS WEIGH IN FAVOR OF THE MANDATORY MINIMUM SENTENCE.

In determining a sentence, a Court must take into account the statutory concerns listed in 18 U.S.C. § 3553 (a)(2) as well as the defendant's unique circumstances. *See* 18 U.S.C. § 3553 (a). 18 U.S.C. § 3553(a) includes a list of "factors" a court is to consider when determining the appropriate sentence ("the § 3553(a) factors"). The court must consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law; and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Here, each of these factors support a sentence of fifteen years, the mandatory minimum.

The nature and circumstances of Mr. Kyzer's offense do not warrant an above-Guideline sentence. There is no allegation that he engaged in online conversations with minors, produced pornography, or distributed pornography. The number of images he possessed, while large, is not out of the ordinary in cases prosecuted in the age of the internet. According to the Sentencing Commission, defendants in 77.8% of cases possess 600 or more images (the highest number accounted for in the Guidelines). *Use of Guidelines and Specific Offense Characteristics for Fiscal Year 2016*, supra. A below-Guideline sentence would be sufficient to afford adequate

16

deterrence to criminal conduct. Studies of the deterrent effect of prison sentences have found that it is the prosecution of crime, rather than the sentence imposed, that has the strongest deterrent effect. In one of the best studies of specific deterrence, which involved federal white collar offenders in the pre-guideline era, no difference in deterrence was found between probation and imprisonment. Another study by the Institute of Criminology at Cambridge University examined the effects of changes to both the *certainty* and the *severity* of punishment. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *See* David Weisburd et. al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995). Accordingly, this factor weighs in favor of the Court imposing a below-Guideline sentence. Finally, a fifteen-year sentence is severe and will provide more than just punishment for Mr. Kyzer's offense.

## V. CONCLUSION

For the reasons discussed above, Mr. Kyzer respectfully requests that the Court sentence him to the mandatory minimum sentence of fifteen years.

DATED: August 16, 2018                    LISA A. PEEBLES
                                          FEDERAL PUBLIC DEFENDER
                              By:         */s/ Courtenay K. McKeon, Esq.*
                                          Assistant Federal Public Defender
                                          Bar Roll No. 515841
                                          Clinton Exchange, 3rd Floor
                                          4 Clinton Street
                                          Syracuse, New York   13202
                                          (315) 701-0080


To:   Lisa Fletcher, AUSA (via ECF)
      Roland Kyzer, Broome County Correctional Facility (via mail)